Good morning everyone. Our first case this morning is Atheon v. Buth et al. Ms. Terhune, whenever you're ready. May it please the court, my name is Abigail Terhune and I represent the appellant Grant Lyon on behalf of the Atheon ESOP. In August 2017, Mr. Lyon was appointed as the ESOP's independent fiduciary. He had no ties to Atheon's management and started a truly independent investigation of the Atheon ESOP and the valuations that had been used to set the price of its stock. He relied on his background in valuation theory and corporate finance. And by September 2017, he had identified the core valuation irregularities at issue in this lawsuit, had confirmed his conclusions with the ESOP's then-trustee Argent Trust Company, and reported to Atheon for that they should stop allowing investment in PDC stock. Mr. Lyon then complied with his ERISA statutory obligation to determine who was responsible for the inflated valuation and brought these claims. The district court found that the Second Amendment complaint stated a claim only as to Argent, the ESOP's final trustee from 2014 to 2017, relying on admissions from Argent's employee about the valuation process. But Argent was only involved at the end and is not the only one responsible for the years of overstated valuations in this case. I wonder, for me at least, it would be helpful if you fast forward perhaps to a discussion of the statute of repose, because I'm not sure the district court was actually saying that nobody else was responsible, but there is this statute of repose that cuts off the ability to pursue certain claims. Yes, he did both, actually, because he did not allow or consider the claims within the statute of limitations period again. Right, but let's just, for starters, look at the pre-November 2012 claims. So that is under ERISA 513, and we need to invoke the fraud or concealment exception to get back past that time period. Right. The district court did not think the concealment could take place in the course of the underlying wrong, and he required a separate course of conduct to conceal, and we think that is inconsistent with the court's holding in Martin V. Consultants and Administrators. The fraudulent concealment can include genuine acts of concealment committed in the course of the underlying wrong. But here's what I'm curious about there. I didn't read it quite as broadly as you are. I think the court, as I understood what the district court was saying, was looking for something beyond just the alleged acts of fraud. It didn't mean, if you think of Venn diagrams, it didn't mean that a certain amount of the behavior was overlapping, but you had to find actually concealment, some sort of, in the And so, why is that wrong? Because otherwise, everything would overlap if just fraud was automatically concealed. People don't usually stand on a high place and shout out, I'm defrauding people. Yes, I mean, this court has drawn a distinction between fraud and fraud that is concealed. But the concealment, the trick or contrivance, can occur in the course of those breaches of fiduciary duty here, the underlying wrong. And we think we've alleged both affirmative acts of concealment that are separate in time from the underlying breaches of fiduciary duty, as well as self-concealment acts that took place during those breaches of fiduciary duty. But you have pled a very broad fraudulent scheme here. And the concealments that you've identified in your briefing, if you go back and look at what you have pled, really line up with places that you have pled that concealment as part of the fraudulent conduct. Well, yes, but again, it can be part of the fraudulent conduct as long as it operates to conceal. Let's take a concrete example. Is just keeping your mouth shut something that operates to conceal? No. All right, so we need something more than omissions to disclose what's going on. What do we have that's more than that?  Well, the stock prices themselves are self-concealing. They are presented as the result of a prudent process, while it's not. I mean, it's important here that a lot of the allegations here are based on a failure to follow a prudent process. But isn't that just violence? Here it is. No, it's an affirmative representation that this is a stock value, and that carries with it a representation that this was the result of a prudent process and a good faith process, according to ERISA 318. How is that concealment as opposed to fraud? I mean, they did not disclose the – well, it's both. It's part of it. I've seen one case that described – used a vase analogy. Stealing the vase is not concealment of anything, but presenting a vase as an antique vase when it's just a replica, that's a self-concealing wrong because it's presented as something that's not, and you don't know that. Let's take a simpler example out of this context. So let's say – I don't know. I guess I go back to this example a lot. My clerks will tell you. Let's say that there's a – I'm selling you a car, a used car. And I say, you know, it's worth $10,000, but I know it's not, okay? And I go, you know how I know it's worth $10,000? Because it rides beautifully, right? Is that concealment? Or is that just fraud? I'm trying to think. Right? And isn't that what we have here, is that there – your allegation is that they knew that the stock price was X, but then they said it was Y, and they said it was Y because it ran really well. The company's doing really well. No. I mean, they had an obligation to follow a prudent process and act as prudent fiduciaries in valuing the stock. And they failed to do so. And in addition to the actual stock prices, we've had extensive communications, newsletters, emails with the employees where they're describing the valuation process. They're assuring them that they're following a proper process. But at the end of the day, they were not. They were ignoring certain key data, for example, the pension liability, and they were applying a control premium. You know, this stuff is not evident from the stock price itself. It's not evidence in the 10-Ks, which we also allege were active concealment. Well, wait a minute, because I believe that the 10-Ks did disclose the total debt. And if somebody wanted to rummage around in the SEC's website and pull up the 10-Ks, they could have found out this. It wasn't – certainly, it wasn't mentioned in the kinds of communications you're talking about. But I wonder if the record really shows that they could not have discovered this pension debt, et cetera, from the 10-Ks. I don't think they could, Your Honor, because it's not – the valuation process, the valuation itself was not disclosed. But I thought the debt was disclosed on the 10-Ks. The debt was disclosed in the 10-Ks, and that is our question. So they could have put this information together in a way that perhaps Appian had not done. But how do you put that information together if you don't know what's going into the valuation number? It's a black box to anyone other than the fiduciaries who are privy to that. They were not disclosing that information. It was confidential information. And so they were not – But again, why isn't that just an omission? Why isn't that just being quiet? Because they are – where's the trickery or contrivance in that? I mean, employees did ask for access to these valuations, and they were denied. And I think that was an attempt to obscure their valuation process. They didn't really want anyone seeing what they were doing in these ESOP committee meetings or what was in the valuations. The valuations themselves were also – they weren't allowed to share these. The express text on the document said they could not be shared without status express written consent. You need the valuation. And Mr. Lyon is the first one who had access to the valuation, who is an independent fiduciary, and could compare the balance sheet and the valuation. And so that is a trick or contrivance, especially in combination with these emails, which are very selectively explaining the valuation process or what went into the valuation, but not disclosing all of these issues. Those emails, which are extremely well-plaid in the complaint – many of them are copied in part or in full in the complaint – are very misleading, and they're directly a trick or contrivance to conceal. I'm still not comfortable with the way you're dealing with the 10-Ks and the other information. Wasn't Mr. Lyon simply looking at this information in a different way? I mean, obviously, when you don't have a publicly traded company, you've got to come up with some valuation of stock, and you're going to look at assets, you're going to look at liabilities. And I'm not convinced that there was the kind of concealment you're talking about, given the publicly available information. Well, I'd note that Fish v. Great Bank dealt with actual knowledge, not this complaint issue, but it deals with knowledge of a process. When do you have actual knowledge of a process? And these kinds of surface-level information does not put you on notice of that process that was used to value the stock. I would also note that the 10-Ks – So are you saying that there is – I mean, I want to get back to the statute of repose, because this really does – either allows you to go forward with a lot or trims this case back quite considerably, if you don't get it. And you are saying that they presented these numbers to the ESOP participants, I'll say, up through this chain of ownership, as though it had been done in an appropriate way and really wasn't done in an appropriate way. That is enough, in your view, in and of itself, to show that there is a scheme to conceal, that there is a process to conceal. And I still haven't quite grasped how that's different from just keeping quiet and saying, this is what we did, this is the value, you know, by the stock. Yes, I mean, that is our position. I believe it's different, especially here when, you know, the financial statements disclose the pension debt and disclose the interest-bearing debt. And obviously, we allege that the pension debt was never deducted, and that is a problem. The interest-bearing debt is actually a harder case because there were portions of the interest-bearing debt that was not deducted. That's even harder to detect. You don't know from comparing this information, I don't know how you can back into those numbers when they're just saying, oh, this $30 million doesn't count this year. Wouldn't the exception get swallowed up based on your argument that any time you're alleging fraud, you'd be able to get around the statute of repose? I don't think that's what we're saying here. I mean, it's not just fraud, it's fraud in a kind of closed environment where other people were not allowed access to it because of specific decisions to not make this valuation. Well, that's often what fraud is, where others aren't allowed access to it. Well, I mean, the line between fraud and, you know, affirmative acts of concealment is not especially clear. You know, Wolin made the point that this is a, you know, that this is a very confusing area of law, and the line is not always tidy. It's always a matter of opinion, for example. Is passing it off as a replica, is that just a fraud, or is that concealing it, the base? You know, I think those acts of concealment, they are acts of concealment committed in the course of the underlying wrong, and we have additional acts here where it's not just the underlying wrong with the stock process of evaluation, but it's also the communications, the later communications to employees about the process, which those affirmatively concealed, along with the 10-Ks, which, you know, they listed the pension debt, and they listed the stock value, and they didn't describe anything about the valuation process. So your position has to be that maybe somebody could look at that and think that the stock value had reflected appropriate deductions for the pension debt. Yes. So on that one point, and this actually goes to the claims within the statute, the ones that you can't get rid of on statute or post grounds, is it your position that just dollar for dollar this pension debt needed to be reduced? Because the argument is made by the other side that it was contingent, it was in the future, you know, maybe some of it would never come about, but it wasn't just a dollar for dollar deduction. I realize you wind up with a company worth less than zero if you just subtract the pension debt. Right. But there is some question about how to treat it. You know, they have put forth a turning argument on that issue. We think it needs to be deducted dollar for dollar. I think the bigger issue is that they didn't consider it at all. You know, it's referenced in a few places in the valuation. Early on, just when they were discussing the balance sheet, they were aware of the pension debt, and yet there's no evidence that they actually took this into account in their calculations. This is very large dollar amounts. You would be saying then, I would guess, that even if you should have just taken 50 cents on the dollar, you've alleged enough at the 12B6 stage to get into the question of how much should be deducted. Yes. And I'll also note that in mid-2016, they recognized a specific short-term need to fund an additional $19 million into the pension plan. And Stout spoke with the ESOP committee members, I believe Mr. Faree or someone on the ESOP committee, and said, oh, we're going to find these other synergies somewhere to save this money so we don't need to take that into account. And that flies in the face of even the defendant's reasoning on why they did not need to deduct the pension debt. But I'd also like to note that I don't think the pension debt needs to be viewed on its own. We've alleged a lot of irregularities with the valuations, including these inflated projections and the control premium and the failure to deduct even interest-bearing debts, such as $30 million of revolving line of credit. So on the control premium, it wasn't a big control premium, though. I mean, you've made the argument that they didn't really have control, and therefore no such premium should be there. But there was kind of partial control, wasn't there? And so this is a partial adjustment? No. No, there was no control. There's a security holders' agreement, which was signed after the, or as part of the 2001 ESOP transaction. At that point, the ESOP trustee was initially able to appoint a minority, you know, their control, their ability to appoint or remove directors decreased over time. And after, I believe, 2005, they could not appoint any directors on their own or remove any directors on their own. And the case law has been very clear that this is important to control, this ability to control. And I also disagree that a control premium is appropriate for this kind of ESOP valuation on an ongoing basis. You know, control is about your ability to recognize a synergy. You know, you buy the whole company, you get some kind of value. That's not what they were using these biannual valuations for. And, you know, that might be explained why some of the third-party offers, none of which succeeded, were slightly higher than you might expect, because they could have gotten that kind of synergy. The employees could not. Can I clarify on your claims against Houlihan? You seem to concede, maybe implicitly, that you cannot pursue your ERISA claims against Houlihan. Do you agree with that? You know, we had a lot of issues to appeal on this case, and we decided that the common law arguments were stronger than the ERISA claims. So you agree you cannot state an ERISA claim against Houlihan? Yes. All right. And while we're at it, you didn't repeat the state claims in your second amended complaint. Yes. And you've briefed the fact that since the district court had ruled definitively on them that they're still alive. Is that correct? Yes. I believe it's Bastion v. Peters. You know, it's already a very lengthy complaint. We knew we were going to face more motions to dismiss, and so why annoy the judge, I believe, is the reasoning of Bastion v. Peters. But why are those state claims not just alternative enforcement mechanisms that ERISA would push aside? So we have claims against the DMOs for corporate breach of fiduciary duty, and those are on behalf of the ESOP as the sole shareholder of Appian. It owned PDC, and then PDC owned Appian. And Halpern v. Richards is actually a related case to this. It's the Appian Liquidators Trust, the creditors committee. And there, the court looked at this kind of dual hat issue. And ERISA's created and bites this kind of inherent conflict where the DMOs are wearing dual hats, and they owe duties to the shareholder. And in Halpern, this court explained that ERISA was not intended to shield directors and officers from that exact type of fraudulent conduct, again, for a corporate claim. And we think that applies to the ESOP here as well, especially because the claims we stated on behalf of, or for the common law claim, are attempted to not address ERISA issues. We left open a question, though, in Halpern about whether ERISA would preempt a similar kind of claim if it were brought by ERISA beneficiaries, et cetera, who have a claim under ERISA. Yes, that's correct. I mean, that's a fairly big reservation. It is. It is. But we've stated ERISA claims that go after what we believe is the fiduciary hat behavior. And then the corporate law claims are meant to address other issues where the ESOP was damaged as a shareholder, but the activity might not arise to ERISA actions. To follow up on Judge Wood's earlier question about not repleting your state law claims against Houlihan, did you give any indication on the record that you were going to rest on them, but you weren't going to replete them? No, that was not apparent. It was needed from the case law on that, I believe. Some cases have suggested that should be given. And to address the state law claims against Stout and Houlihan, these are fraud and negligent misrepresentation and breaches fiduciary duty for Houlihan claims, and they are just, you know, these are garden variety tort claims. They don't relate to the ESOP plan in any meaningful way. ERISA does not regulate their conduct. You know, it doesn't explain how the trustee is supposed to act with respect to evaluation. It does not explain how Stout is supposed to act with respect to evaluation, for example. And I don't believe the ability, whether, you know, theoretical or not, since the court has not addressed whether you can bring an ERISA 502A3 claim against someone in this case, I don't believe the ability to bring that claim should borrow this, you know, that's an 80 and abetting claim. This is a direct claim based on direct duties owed. You are into your rebuttal, if you want to say that. Yes. Up to you. Thank you. Mr. Martin? Good morning. Craig Martin. I represent the directors and officers, those defendants with regard to this case. We request that the judgment of the district court be affirmed. Just to put this case in context, Appian, just the company, the way I always think about it is it's one of the companies that made a paper that you used to use for credit cards with the carbon in the back. We've seen lots of cases involving Appian and Appleton in more environmental settings. Yes. We don't see that paper anymore. So, a little bit of a... And you've been cleaning up the Lower Fox River for a long time. Quite some time. Look, the core theory with regard to this case is that the directors and officers and the others engaged in a long-term fraudulent scheme to inflate the stock price from the beginning transaction throughout the entire time. The case with regard to the issue that you were just talking about a moment ago is the 29 USC 1113 issue. And I'll spend a little bit of time giving you our take with regard to that issue. The Seventh Circuit in the radiology case clearly lays out some parameters and essentially going to the Venn diagram says that you can't really have the same exact fraud to extend the statute. So, a very... But why isn't it, for the post-2012 claims, the ones that we're not going to worry about the statute as proposed, why isn't just to take what seems to me one of the big examples the continuing failure to reflect this huge pension liability, something that requires further development in this litigation, whatever may come of it eventually? So, the post... I'll go to the post-2012 claims. And the district court with regard to those claims essentially holds that they failed to plead fraud with particularity under Rule 9b. And I read that and I love Rule 9b. I like all the procedural rules. But you don't assert intent, knowledge, motive with the specificity that Rule 9b otherwise requires. There's an explicit carve-out for those things. Those can be alleged generally. And there's a great deal of detail as to the who, what, when, where, why, how, parts that you do need to spell out clearly. So, I'm not sure that the district does seem to be kind of conflating the particularity requirements with its notion of plausibility. And those are just two different parts of the inquiry. Yeah. So, I think the district court, whether the district court conflated it or not, I think the main point with regard to the case of 9b is this. With respect to the 17 directors and officers, and I'll just take them as an example. The 17 directors and officers do not, and there's no allegations anywhere, that they are involved in the valuation. They're not involved in the valuation. They're not involved in whatever was going on with Willamette and Stout who were doing the valuations over a long period of time. The directors and officers were not, to use the Hamilton analogy, they were not in the room where it happened. And there are no allegations with regard to, here's how we came up with a valuation and here's why it was fraudulent. But didn't they have a supervisory duty though to, I mean they couldn't just rubber stamp anything that Stout put in front of them. There's certainly a supervisory duty, but in this particular case, the core allegation against the directors and officers in each and every one of them is that they participated in fraud. And the fraud needs to be pled with particularity. And with regard to the valuations, just to kind of get into that a little bit more, you know, what would be fraudulent? What would be fraudulent is if the directors and officers or some director or officer had one set of books and it said we were going to make, you know, 17 widgets next year. And our profits were going to be 50%. And that was the set of books that was used to trick the rest of the system. And then had another set of books that said, well actually we're going to make seven widgets and our profits are going to be, our margin is going to be 20%. That would be classic fraud. That's what would need to be pled here. There is no allegation of classic fraud. And when you have the debate, or I should say the discussion, Your Honor, with counsel to the appellant with regard to, well this is a pension liability, how much should it be valued at and so forth, that's a legitimate discussion that would go on in evaluation and I can imagine people doing their discounted cash flow analysis and their multiples analysis and so forth. Well so can I, but I don't know how you come up with zero after that evaluation. That's what bothers me. Not whether it was dollar for dollar, but it could have had a profound impact on the imputed price of these non-publicly traded shares. Right. And to go to the, I would not, I'm not here to second guess the valuation, right, but to go to the fraudulent allegation, the fraudulent allegation might be, you know, to take that as an example, we have a pension liability. It's $1. We think that that pension liability is going to be 90 cents and it's going to hit us in 2027. And that's one set of books that we have. And then there's another set of projections that we have that we don't give anybody. Are you saying there are no allegations that the directors and officers knew that these should be included in the valuation and they weren't? There's no allegation that they, there certainly, look, it's just true that that is known as we point out in the 10-Ks and so forth. The pension liability is known. But in terms of how it's used in the valuation, the directors and officers are not involved in the valuation. And there's no allegations of what they did in the valuation. The only allegation with regard to the directors and officers really is that they had overly rosy projections. Well, that's exactly what I wanted to ask you about next. It's not that they had an overly rosy projection for one year and then they righted the shift, so to speak, going forward. But year in and year out, the projections were in excess of performance and they kept using these numbers that were becoming increasingly unreliable. In terms of the numbers and the projections that they were using, they were using projections and they were giving them to a valuation firm. And there's no evidence, the wrong word, there's no allegation with specificity under Rule 9B that they were doing something that was fraudulent with respect to their projections and valuations. So we wake up every day and we say whether or not our business is going to make money and we go ahead and project for the next year. And sometimes we project well and sometimes we don't project so well. But you always project badly on these allegations. On these allegations, they always over-project. But it's not the only company in the world that over-projects and that doesn't mean that they engaged in fraud. If they had a different set of projections that they were failing to give to somebody, that would be a classic allegation of fraud, which is what you don't have here. But you don't have to have the two sets of books. I realize that's an example you can use, but if the other hypothetical set is just in their minds, the Second Amendment complaint pleads that this is something that pumps up the value of the stock that causes the ESOP to overpay for its shares and it redounds to the benefit of, among others, the directors and officers. We need to put all these facts together, right? Yes, but respectfully, it's not a negligence theory. No, it's a deliberateness theory and it's pleaded as deliberate, but that's the intent which you can plead generally. Yes, with one exception under the PLSRA. But in terms of... We're not talking about the securities claims right now. Yeah, but in terms of the allegations with regard to projections, there's no allegation with regard to the who, what, when, or where of fraud with regard to those allegations. There is an allegation that they made projections and that their projections were overly rosy. That is an allegation. In terms of what you would expect in a commercial setting is that a valuation firm that was dealing with a company for many years would have their own view on that. So, for example, and by the way, I don't know because there's nothing pled about it. So, a valuation firm in an evaluation may say, well, look, they've come in and they've said that their projection is this. I'm going to discount that by 22% and so forth. The truth is that happens in business all the time and that would happen in a valuation expert conversation as well as how to account for the pension liability, the control premium, and so forth. But there's no allegation that there is fraud embedded in those valuations. I think there are allegations. Your point is really more that you don't think there's sufficient. Of course, we have the disadvantage in this case of overwhelming amounts of paper that it's a Second Amendment complaint. For whatever else you criticize it, it cannot be criticized for brevity. It's the opposite. So, hidden amongst those hundreds of pages are actually quite a few allegations of fraud, it seems to me, of knowing behavior, not simply negligent behavior. Coming through the big complaint that's in my binder, under Rule 9b, if you tie it to the 17 directors and officers, they do not allege under Rule 9b that there are people that who, what, why, when, how have fraud with regard to the valuation. Can I ask you whether this group of 17, everybody agrees they just stand or fall together, there are no internal distinctions among them? There are internal distinctions among them. For purposes of the 9b argument, I don't think there's any meaningful distinction among them. At times, the complaint is more specific about one person or another, but it is never specific when it talks about fraud. The distinction would be timing, too. Some of them were only involved pre-November 2012. Yes, I have a big chart. I have one, too. Mr. Martin, if I could ask you about the preemption issue. It, you know, combing through the, looking at the complaint, there seems to me instances where the breach of fiduciary duty that's alleged against the DNO defendants really are just run-of-the-mill corporate breach of fiduciary duty claims. So, for example, you know, if you look at around the vicinity of paragraph 770 and following, it talks about how the directors kind of breached their fiduciary duty to the shareholder because of the way they handled the NCAPSIS transaction, right? We see that in regular corporate lawsuits all the time, right? So, there it seems to me that the claim is being brought up as in the capacity as shareholder, and even if the shares were held by an individual, for example, the same claims would exist. And so, why isn't that an example of a portion of their fiduciary duty claims that might not be subject to a risk of preemption? So, that's the question that was left open in the last case, right? And with regard to, I don't have that particular paragraph memorized, so. Oh, I didn't either. I had it written down. Yeah. So, with regard to, you know, going back to the preemption statute, right? It relates to an ERISA plan. These are ESOP participants who are part of an ERISA plan. Right, but if the claim could have been brought, whether or not the owner of the shares was an ESOP participant, was an ESOP, or whether it was just, you know, Joe Smith off the street, if the duty would have existed under state law under either scenario, what is the argument that such an independent and parallel duty should be preempted under ERISA? Yeah, so I think it – look, I mean, I think it gets right into the last opinion, but it's in terms of here you have ESOP participants who are stockholders. They are clearly within the ERISA statute. In the case of a regular corporation, you have shareholders who are not within the ERISA statute. And so, is your argument the very fact that the shareholder is a ESOP that basically automatically takes any breach of fiduciary duty claims or preempts any state breach of fiduciary duty claims? I don't know that I would say it that cleanly, but I would say in this case it does because the allegations arise out of what is core and fundamental to the operation. So, of course, my next question is, what is an example, if you say it's not as clean, of a claim for breach of fiduciary duty in state law that would not be preempted by ERISA in your mind where the shareholder was an ESOP? Can't think of one, to be honest, because the fundamental duty is governed by the ERISA statute and the ESOP statute, and therefore it is preempted and it is also the exclusive remedy. So, I think that it is a complete distinction versus corporate shareholders in a typical public company. So, get back to my question. You would agree then with the proposition that whenever an ESOP owns shares in a company that all state breach of fiduciary duty claims are in those cases preempted? I think so. I can't think of an example. That's why I said I don't know that I agree with you as cleanly because I can't think of an example standing here today. Mr. Martin, I know we've kept you beyond your time, but the focus has been on the fiduciary duty claims. I have a question about the prohibited transaction claim against the directors and officers. How do you get around Alan? That's a great question. You're saying factually other than the loan, which wasn't involved here? Yes. How do you get around the broad holding of Alan on the prohibited transaction? Give me one second. Okay. Sorry. And just saying Oshkosh isn't going to do it. Look, here's my basic take with regard to it. There's 406 and there's 408. You're referring to the Alan opinion. I think the holding of the Alan… On the prohibited transaction, not the fiduciary duty. Yes. I think the issue there is that it's an affirmative defense in that case. Correct. I'm with you there. In this case, they pled themselves out of court. How so? If you look at the complaint, the second amended complaint, I'll give you sort of exactly where it is. It's paragraph 186 of document 36, which is page number 321. And it is within count 21, the first prohibited transaction. They plead that these transactions are not exempt under ERISA 408 because the purchase was not for adequate consideration. Could you go back to the microphone, please? Sure. Sorry about that. So, paragraph 186, they plead, I'll just read it, that these transactions are not exempt under ERISA 408 because the purchase was not for adequate consideration. And they do it in each, the other paragraph that they have the exact same language on is paragraph 1139. And those are the two prohibited transaction claims against my clients, the directors and officers. The reason I say that they pled themselves out of court is this. Their core theory with regard to why the exemption does not apply, 408E, is that there's not adequate consideration. Their core claim with regard to why there's not adequate consideration is the fraudulent inflation of the stock price over a long period of time, which is fraud that is not pled with particularity in this case. So, I think that's how the 406 claims drop in this case, and that's how you make it consistent, or it is consistent with that one. So, you're saying they haven't pled enough to establish that the consideration wasn't adequate. Correct, and they took the burden upon themselves. This is why I say pled themselves out of court, because they decided in their pleading to take on the 408E issue. So, it would come back to 9B on the prohibited transaction. Yes, it ultimately collapses back to a 9B analysis. But that's how you address the Allen case, because if you want to take on the affirmative defense, that's fine, but then you have to take it on. Thank you. Thank you. Good morning. Good morning. May it please the court, good morning. My name is Matthew Riffey, and I represent State Street. I would just like to briefly focus on a couple of key points. The first is the statute proposed, which bars almost all the claims against State Street with the exception of the one December 2012 valuation, and that's because plaintiff's fraudulent concealment allegations are especially deficient with State Street, because the complaint does not contain any allegations of an act of concealment intentionally undertaken by State Street. There's only two statements attributed to State Street in the entire opening brief or complaint. They do not come close to possibly alleging an affirmative act with specific intent to conceal. Given the lack of allegations concerning State Street and its reply, plaintiff attempts to make State Street responsible for statements or actions of others, because it had the authority to review or approve certain documents, but this argument was not mentioned in his opening brief, thus it should be forfeited as he acknowledged it wasn't in there in footnote 15 of his reply. But regardless, simply alleging that State Street reviewed and approved documents without any particular allegations to the who, what, when, or why does not satisfy Rule 9b. And the argument is also foreclosed, as you already discussed this morning by Martin's rule, that there must be some affirmative act and mere silence is not enough. To the extent plaintiff is seeking to rely on self-concealing acts of the valuation itself, as this court explained to Martin and Laskin, fraud claims don't receive the benefit of ERISA's exemption simply because they're fraud claims. There has to be genuine acts of concealment. And here there's no plausible allegations that State Street actually subjectively knew the valuation was false, much less that it communicated the stock value as part of some trick or contrivance. But didn't the district court overstate things, though, when it tried to create a sharp distinction between the underlying fraud and acts of concealment? I mean, there's a lot of overlap in the real world. Certainly. I don't think the district court overstated it, as is clear in Martin, which is still good law, and restated in Laskin. There has to be some genuine act of concealment. It can't just be the fraud itself. There has to be something to conceal. Martin gave an example where the fraud was the creation of a dummy corporation to conceal kickbacks, which was the fraud itself. There's nothing like that alleged here. Right. I mean, there's nothing more extreme. But what is alleged is, I guess, failures to dig into things enough, deliberate decisions to skew the evaluations in an upward direction. I don't think there's any deliberate decision that's alleged against State Street to skew in an upward direction. State Street was just the trustee that was reviewing the appraisals and relying on the appraisals from the independent expert, the appraiser. Which brings me to the second point, the one stock valuation during State Street's tenure that was not time-barred in plaintiff's students' claims generally against State Street. We don't believe the district court applied a higher standard of pleading than articulated by the Supreme Court or this court in Albert. And it didn't apply, and we're not arguing for a per se rule that all a trustee has to do is hire and rely on an appraiser. What we think the district court correctly did was apply the context-sensitive scrutiny that it needs to apply and found the plaintiff's claim against State Street didn't go from possibility to plausibility. We have all these metaphysical differences. I understand you'd be saying then that you're not relying on a statement that just because Stout was hired, you're home free. No, as the Seventh Circuit has stated, it's highly relevant. But no, that in itself does not get State Street home free. It also complied with planned documents. The court found there was no allegations of kickbacks or any logical incentive for State Street to defraud or to not have a sufficient process. And I think the context here is also very important, given the sprawling allegations and the 17-year period that this case covers. Appian continued to operate for 17 years after ESOP was formed, or nearly 17 years after it was formed, which distinguishes this from the ESOP stock cases like Allen and other cases where as soon as it's formed, the stock drops 50%, 100%. That didn't happen here. The stock valuation went up until the Great Recession. It decreased in response to outside factors. And then to the extent that Appian ultimately went into bankruptcy, it was only after the sale of Encapsus, the most profitable wing of the company, which happened in 2015, long after State Street. Thank you. Thank you. Ms. Smith. Your Honors, may it please the Court, Barbara Smith for Reliance Trust Company. The District Court below correctly dismissed all of the claims and the complaints against Reliance. And I'm happy to walk quickly through why that's so as to each claim and the complaint as related to Reliance, if that would be useful. But I don't want to belabor the Court's time. I know you're hearing from a lot of advocates and you have a lot of briefing. There's a heavy paper load in this case, as you suggested, Judge Wood. No, I mean, which is fine. I mean, it's a complex case. So, you know, it's a civil procedure, either nightmare or dream. Dream. Yeah. Whatever you want to say. But your basic position, again, is that the pleadings themselves are inadequate. That's an issue on which our review is de novo, of course. That's right. We're going to look at that complaint and see if knowledge of another fiduciary's breach has been pleaded at adequately, for example. We haven't talked much about that. With respect to the securities laws, we haven't talked much about them either, but we all understand that this is PLSRA territory. But what about the co-fiduciary liability? Could you say a word about that? Sure, absolutely. So in order to state a co-fiduciary liability claim, the plaintiff would have to have alleged that Reliance knew of a breach by another fiduciary. That affirmative knowledge is an important component of the co-fiduciary liability language in the statute. It's clear from the statute it's been well-established in a number of other cases and other circuits, and I think that contrary holding that something less than actual knowledge here would create a conflict that maybe the court doesn't want to walk into. So if we take that as the baseline that you have to establish or allege actual knowledge, there's nothing in this complaint aside from the conclusory allegation that there was knowledge. Which is okay. Right? Well, you do need a plausible fact to support that conclusory allegation of knowledge. The legal standard is knowledge. The fact that has to support it in the complaint is what is absent here. So it's not enough to say there was this, particularly in this case, there's not enough to say there's this 17-year ongoing fraud and Reliance knew about it and therefore can be liable as a co-fiduciary. That is not sufficient to have alleged a fact to establish knowledge as related to Reliance. So you're saying it may meet Rule 8A, but it doesn't meet Twombly? It doesn't. There's no plausible fact to support an allegation of knowledge with respect to Reliance, because there are just no facts about Reliance's knowledge either way. There's just the conclusory statement that Reliance knew. Yeah, the troublesome thing about that, once you're in Twombly territory, and this is just inherent in the word plausibility that the court chose to make the pivot point here, is the district judge needs to read this complaint with an open mind. Plausibility doesn't mean probability. Maybe it means well less than a 50% chance of winning. The court has had all sorts of statements to that effect. So there's that. But then the court is going to be looking at that and saying, does this make sense to me? And does that go over the line for the 12B6 stage? Because the court is not supposed to be deciding who would I think should win. Or in the words of Alan as related to the breach claim, can I infer an imprudent process based on the fact of alleging this complaint? And I think with respect to the risk of breach claims in particular, the prudence claim for example,  the first is this fraud-based theory. You knew of the fraud and you did nothing, and you run squarely into 9B problems with that particular theory of liability. The other, of course, that they've alleged in the complaint is that the face of evaluations are so obviously erroneous that we must conclude there was an imprudent process. Or at least at some point along the way. Maybe not year one when there's the overstatement of the value. But as the process develops, they're in a position, they're the trustee, they're in a position to see what's going on and whether it really adds up. They've seen the 10Ks presumably. They have some duty to sit there and see something other than a potted plant. That's absolutely correct, Your Honor. And I think it's important to keep in mind with respect to reliance, they came on as independent trustee many years, decades after the alleged initiation of this fraud. And do you think that exempted them from taking a look at what had happened up to that point? I mean, if you were to hire a new independent auditor for a firm, is that new independent auditor entitled to just start from the day that the firm was engaged? Or does that new independent auditor need to look at prior books to make sure that the firm is dealing with reliable data? Well, whether the valuation firm should have looked at different valuations, I think, or different data would be a question for them. And whether reliance as the independent trustee adequately asked the right question. Right, asked the right question. That's right. The question there is for the period of time during which it was trustee, did it ask the right questions? Not did other trustees in previous eras ask the right questions, but for the two valuations that occurred during the brief period of time reliance was in this case, did reliance do what it was supposed to? And there I think the question the court asks is, what are the allegations in the complaint with respect to the prudence of reliance in particular? And on the one side of the ledger you have very prudent fiduciary conduct. You have hiring an independent appraiser. You have asking questions of that independent appraiser. You have notes on a meeting that address the very complicated issues Judge Wood and Judge Saini that you mentioned earlier about things like the company's debt. Those are indicia of prudence. It doesn't establish prudence, but it suggests an inference of prudence. On the other side of the ledger, there are no allegations. There are no process-based allegations that reliance was imprudent. It is just the plaintiffs say so. It is because we would have done the valuation differently, you should have asked the questions we would ask to come up with a different conclusion. And that we suggest not enough. They're basically saying that when Mr. Lyon undertook these things, it's like he turned over a rock and he found all sorts of things crawling underneath it, and it wasn't that hard for him to do it. So that would lead to an inference that's the opposing inference, right? Well, it may be the case that if you come into this case during the time of the bankruptcy in 2015 or later, that you might look at projections leading up to that time period and come to a different conclusion. But if you look at the projections just in 2012 and 2013, which is all that you look to with respect to reliance in particular, you don't have that same problem. And again, the question is, at the time they reviewed the valuation reports in 2012 and 2013, did they ask the right questions? Did they probe on important issues? And the notes that the plaintiff has put in the record of the meeting with the valuation firm suggest the answer to that question is yes, which leads to an inference of prudence, not an inference of imprudence. And I think particularly in a case like this, as my co-counsel said, the plaintiff has pled themselves out of a complaint because they're relying on this decades-long fraud. If they had written the complaint differently, if they had targeted their claims more narrowly, maybe we would be in a different place. But you can't allege a decades-long fraud and then try to walk back from it and say, all of my ERISA claims related to you sometimes rely on fraud and sometimes don't. You look, Judge Wood, as you know, at the complaint as a whole and all of the allegations in the complaint, not any one allegation in isolation. And in light of that, I think that makes the allegations against reliance here particularly improbable to the extent they exist at all. Thank you. Thank you. Mr. Golombek? Good morning. Lars Golombek on behalf of Stout Recess Ross and the individual stout defendants. The stout played a very limited role as the appraiser for the ERISA trustee and provided valuations for ESOP administration purposes, which the Hopron Court concluded was service central ERISA function. In doing so, Stout provided no services to the company or to the plan. Looking at the specific claims brought against Stout, the stout defendants, the federal securities fraud claim, the district court properly concluded that it should be dismissed for failure to plausibly allege the answer. And the district court found correctly that there was no cogent explanation for why Stout would commit fraud, not negligence. We can talk about that in a second, fraud. First of all, Stout received a fixed $50,000 fee each year for the semiannual valuation it prepared, so $100,000 annually. The district court, though, went beyond that and said, let me look at the circumstances overall and in the context and found that there were no fraud-based reasons for Stout to find an allegation of stanch or a plausible allegation. And I want to get to a couple points that you brought up earlier, Judge Wood. One is about stock price. Now, at a high-water mark, Stout valued the shares of stock at $33.41 a share. Within a decade, we went from here to $6.85 a share. That's an 80% decline in stock value. If the allegation is Stout was trying to prop up the value of shares of Aplion stock, they did a lousy job of it. Another key data point. There was a sale of a business division in Capsus. So Stout valued that business division separately each year. At the time of the sale in Capsus, Capsus was sold for $208 million. In that same year, Stout had valued that business division for $166 million. That's an over $40 million difference. Importantly, Stout used the same projections that the company provided to them in the ordinary course of business in helping to develop that price. And so the market price was $40 million higher than Stout. Again, the judge looked at this and the circumstances, again, to determine whether there were fraud-based reasons. We talked about pension debt earlier. Each year, Stout's report disclosed the pension liability and its treatment of the pension liability. And I understand from Appellant, what they say is the regularity is that their evaluation professional would take the enterprise value, the value of the subject company as a whole, and subtract the pension debt. What Stout did instead is two things. One, it took the projections provided by management, which assumed a pension expense. So that was the basis for the discounted cash flow analysis. Stout didn't stop there. They also conducted what we would call a guideline company method. So they looked at comparable companies traded on the stock exchange that had a pension debt, and they picked those companies with a pension debt. So there was a like comparable because it wasn't essentially publicly traded. And so all things being equal, the multiples used to derive a value from this separate analysis would be lower. And they went one step further. They took that lower multiple, and that was a basis for deriving what we call a terminal value, which was looking at valuing the company into perpetuity for purposes of coming with a concluded value. So I understand, and we've heard references to irregularities in evaluation. That does not constitute fraud-based reasons. I want to turn quickly to one other, the state law claims against Stout for negligent misrepresentation. In those claims under state law, and there's a state law fraud claim, those claims are preempted. Halprin said this is a central ERISA function. Stout's doing the same thing to the same trustee, preparing semi-annual evaluations. The claim here for preemption is even stronger because, as Halprin noted, it's in a footnote, but they noted, where here you have an independent fiduciary bringing a claim ERISA provides for a cause of action under 502A3 of ERISA against a non-fiduciary like Stout for knowingly participating or knowingly concealing a fiduciary breach. That is the further grounds for preemption of these state law claims against Stout. Thank you. Mr. Kimberly? Thank you, Judge Staney. This is a complex case. It involves multifaceted allegations and a complex statutory scheme. I hope to persuade you that, with respect to Houlihan, the case can be affirmed for a very simple reason, and that's waiver. As a starting point, I understand my friend on the other side now to concede that the ERISA claims as against Houlihan are off the table. They're waived. That appears on page 12 of the reply as well. So that leaves only the state law claims. And our position is that those claims are also waived twice over. And I'll start with the simpler reason, which is simply that they weren't briefed before this court. We had an overlong brief filed as an opening brief, and yet in all 20,000-plus words, not a single word was devoted to the question whether the state law claims should be reversed on their merits and not just on the question of ERISA preemption. So, you know, this court, in cases like Mayer and Blagojevich, has been very clear that when there are two independent grounds on which a district court bases its ruling and the appellant challenges only one ground and not both, it would be impossible to produce a different outcome by reversing on just one. And that rationale applies here very straightforwardly. In their reply brief, in his reply brief, Mr. Lyon asked this court effectively to disregard the waiver, citing Blagojevich as an example. But in Blagojevich, the government expressly waived the waiver, an oral argument. We are not doing that. I would add also that there are elements of the state law merits that have now been raised for the first time in the long history of this litigation in the reply brief before this court, and that is precisely why it's important in this circumstance to enforce the waiver because there are new authorities being cited, new arguments being made, and Hooligan has had no opportunity to address any of these arguments, as to which we have very strong rejoinders, but no opportunity to respond. Can you give an example or two of those arguments? Certainly, Your Honor. I'd point the court to page 20 of the reply brief, the discussion about the duty to disclose. These are all new arguments. We've argued all along that there is no duty to disclose, and we've not had an opportunity to address the new citations to authority on this point. And frankly, that's all the court has to say against Hooligan. Hooligan's role in this case ended in 2000 when the ESOP was formed,  so the question of timeliness is even more obvious in this case than it is with respect to any other defendants. Unless there are questions about the merits or the waiver question, we'd ask the court to affirm as against Hooligan in a single sentence saying that the claims are waived. All right. Thank you. Mr. Hoon, back to you. First, I want to address Mr. Martin's argument that there were no arguments that these NOs were involved in the evaluation, that they weren't in the room where it happened. So we have pledged in the complaint various ESOP committee meetings where they both reviewed the valuations. They suggested things to include in the valuations, and then they actively approved them. In addition, Stout was not actually independent. They were recommended to be retained by Hooligan in 2001, as Willamette at the time. In 2002, the DSNOs then recommended retention of Willamette. Same thing happened in 2005 when these employees moved to Stout. And then, importantly, in 2013, when Reliance took over as trustee, retention of Stout was a condition of their engagement agreement. That's plotted in paragraph 574 of the complaint, I believe. So that makes them not independent, and the DSNOs directly involved in this whole process. So in addition, Rule 9b, I'd like to really highlight that. That makes them not independent. Just because Reliance wanted to bring along Stout to do the evaluations, how does that question independence? Well, who are they trying to freeze here? The ones that keep hiring them? The DSNOs who they've worked with for decades and are recommending retention of them? I believe that impacts their independence here. It was Reliance that wanted to bring Stout along, not the DSNOs. No, I believe that was the DSNOs. I thought that's what you said. No, the DSNOs required them to retain Stout as part of their engagement. Now, with respect to Rule 9b, I think it's really important here that Mr. Martin has framed this as everything's based in fraud. And that's disregarding the elements of breach of fiduciary duty. Elements of a breach of fiduciary duty is there's a fiduciary, they breach their duties, and there's harm. Knowledge alone, that something, that the valuations might be inflated, that doesn't transform the entire allegation into a fraud allegation. And finding that it would, would basically turn all ERITA claims into fraud claims, and I think that would be a bad result. However, even within that, we have, in addition to, you know, that general breach of fiduciary duty, we have breaches of duty of loyalty, which expressly do not involve any kind of misrepresentations. There are no averments of fraud. We have, against the outside directors in particular and the CEOs who were members of the Board of Directors as well, we have breaches of the duty to monitor. That's literally just a failure to, at reasonable intervals, check in on the fiduciaries they appointed. Again, that does not involve fraud in any way. With respect to their knowledge, regardless, you know, we've had extensive facts about Benrose Booth, which we think put the D's and O's on notice that the pension liability should be deducted. We have expressly, for the outside directors, whose claims are only stated as of that time, December 2007, with the exception of Count 18, Mr. Stewin, who joined later, and his claims are only within the statute of limitations time period. Again, these are outside directors. We contend that the Benrose Booth facts put them on notice because there they were deducting about $15 million in Benrose Booth's, you know, subsidiary pension liability from AtBeyond's debt as a whole. But there was argument, though, that the Benrose Booth situation was somewhat different. It wasn't so much future liabilities, if I'm remembering correctly. It was distinguishable. I believe State Street made that argument, but that was pure attorney argument. Well, I mean, don't say that. I mean, we're conducting a de novo review ourselves, and I guess we're all lawyers, you know, so maybe that's something. And if they are factually distinguishable, then maybe the lesson wasn't as clear as what you're suggesting it was. I mean, Stout here made most of their arguments outside, you know, substantive arguments outside of the pleadings, and we submitted expert reports to the district court and requested conversion to summary judgment. And the court declined that and decided the issues against them solely based on motive. Our experts disagree with that principle that you don't have to deduct the pension liability except for this near-term liability like that. So you're essentially saying on a 12B6 lens, we have to assume that this was not a sound practice. Yes. I mean, this is something to show that it was later, but we would have to take that assumption. Yes, I would expect this to be a battle of the experts later on, but I don't think that's appropriate to decide on a 12B6 motion. With regard to the issue of preemption as to the state law claims against the DNOs, can you identify an obligation that state law imposes that the plaintiff would not be able to enforce or effectuate under ERISA? Yes. I believe we pointed to, you know, ERISA is about enforcing benefits. Monies due generally with an ESOP valuation, cases say it's the difference between the price paid and the value stated. You know, our state law claim is directed to things like corporate waste, the INCAPSUS sale, which, you know, we never contended the INCAPSUS sale wasn't for fair market value. We don't believe it's, you know, the stout valuations of that are as important as stout says. However… But isn't that part of your ERISA fiduciary duty claims as well, that by not exercising their role properly or adequately, they deflated the stock value and that also harmed the ESOP participants? I mean, I think the ERISA behaviors and obviously the, you know, I think that's a question of discovery what was actually being done in a fiduciary capacity as well. But I think these decisions to sell INCAPSUS are not necessarily fiduciary decisions. And, you know, we'll figure that out as we go, basically, as we do discovery when we look more at what was actually discussed in these meetings, how this lens was viewed, whether they were following a proper process, whether it was an ERISA capacity at all. But it did harm the ESOP as both a shareholder and as the ESOP itself as an ERISA benefit plan through the value of the shares. I believe, you know, as this court explained at Halperin, ERISA is meant to tolerate these kinds of dual-hat liabilities and we should be able to pursue it for damage to the shareholders. But there's also the rationale in the cases that talk about how the conflict preemption provision is designed so that a plaintiff could not basically get another alternative way of obtaining the same relief that the plaintiff would be able to obtain through ERISA. My question is, is it the same relief or not? And I think that's attempting to get at damage to the corporation that only very indirectly would have flowed down into the stock value. And the stock value itself is, again, not really a full reflection of the balance sheet. You know, it's an artificial closed number that they've created over time. So you've also alleged derivative action, right? No, we do not have a derivative action. That was reserved in the bankruptcy court to the creditors committee. Thank you. All right, so I wanted to further address under Rule 9B the prohibited transactions claim. That claim, you know, it's ERISA 406A. You know, this court described it as a bright-line rule in Allen. It's a per se liability, a per se violation. And the elements are a fiduciary knew or should have known that a transaction violated ERISA 4A and the fiduciary caused the transaction. Those are the only elements. You're only pursuing that against the directors and officers, correct? Correct. And there's been no dispute that they caused the transaction. The second amendment complaint describes in detail what those transactions are. There's appendices to the complaint which lists each of the transactions, lists the D's and O's there at the time, you know, lists what the transaction is for and the approximate date. So even if that claim needs to be applied with particularity, those elements are applied with particularity. I'm very concerned about the idea of bringing all of the elements of a fraud claim into these breach of fiduciary duty allegations where it's not necessary for the claim. And, you know, if they, you know, their actions don't necessarily carry out or involve a vermin of fraud. The ones that do involve a vermin of fraud, misrepresentations here, are pleaded in specificity. You know, we've quoted from the communications. However, their actions behind the scenes are not statements. And the same applies to the trustees. They're attempting to, you know, import knowledge requirements and transform knowledge allegations into fraud allegations, and that's simply not warranted under ERISA or under the basic elements of breach of fiduciary duty. Thank you, Mr. Hood. The court will take the case under advisement. Thanks to all counsel.